DECISION ON OBJECTIONS TO MAGISTRATE'S DECISION
{¶ 1} Relator, Owens Corning Fiberglass, has filed this original action in mandamus requesting this court to issue a writ of mandamus ordering respondent Industrial Commission of Ohio to vacate its order denying leave to take the deposition of a commission specialist as well as its order awarding permanent total disability compensation to respondent, Mark F. Roberts, and to issue a new order authorizing the deposition, followed by a new permanent total disability compensation hearing and determination.
 {¶ 2} This matter was referred to a magistrate, pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, who issued a decision, including findings of fact and conclusions of law. (Attached as Appendix A.) The magistrate concluded that relator failed to establish that the commission had abused its discretion and that this court should deny the requested writ.
 {¶ 3} Relator filed objections to the decision reiterating numerous arguments made before the magistrate and addressed by the magistrate in her decision. Those objections are: (1) the magistrate confused the requirement to participate in vocational rehabilitation with the commission's duty to consider nonmedical/vocational factors when making a PTD determination; (2) the magistrate disregarded the fact that Dr. Rutherford's functional capacity findings of part-time work required a consideration of State ex rel. Stephenson v. Indus. Comm.
(1987), 31 Ohio St.3d 167 factors which the Industrial Commission failed to do; (3) the magistrate erred in finding that the ambiguities and resulting defects contained in the report of Dr. Rutherford did not require leave to take his deposition; (4) the magistrate erred in finding that the Industrial Commission's order denying Owens Corning's motion requesting the deposition of Dr. Rutherford complied with State ex rel. Noll v. Indus. Comm.
(1991), 57 Ohio St.3d 203; and (5) the magistrate erred in finding Dr. Meagher's opinions sufficient to support the Industrial Commission's order of PTD. While we believe those objections were adequately addressed in the decision of the magistrate, we will review each briefly.
 {¶ 4} First, the magistrate correctly determined that vocational retraining factors are irrelevant when the threshold determination is that the worker is medically incapable of any sustained remunerative employment. Moreover, the magistrate further considered this issue and accurately determined that even if a requirement to participate in vocational rehabilitation could logically be imposed upon a worker who is determined to be medically incapable of any sustained remunerative employment, the record in this case supported a finding by the commission that respondent did engage in those activities at an earlier point after his industrial injury.
 {¶ 5} Second, Dr. Rutherford made no "functional capacity findings of part-time work" necessitating consideration of theStephenson factors. The findings that Dr. Rutherford did make which might have supported an analysis of part-time work capacity were immediately qualified within the same paragraph of his report as not supporting a finding of capacity to work:
* * * Mr. Roberts could sit only 4 hrs. out of an 8 hr. day, and he could stand and walk only occasional meaning 2 ½ hrs. out of an 8 hr. day. He could drive for his own transportation only. He could lift up to 15 lbs. occasionally. Mr. Roberts[,]however, has continued pain when sitting and has flare-ups of hissymptoms in which he has increased difficulties and significantlydecreased functional activities. It's my medical opinion that there is no combination of sitting, standing or walking that Mr. Roberts could do for an 8 hr. day for sustained remunerativework activity. It's my medical opinion that Mr. Roberts has a 16% PPI of the whole person based on his orthopedic claim allowances and that he is not capable of physical work activity
* * *.
(Emphasis sic.)
 {¶ 6} Third, the magistrate correctly applied the relevant law, State ex rel. Cox v. Greyhound Good Mgt., Inc.,95 Ohio St.3d 353, 2002-Ohio-2335, to the question of the denial of the motion to take Dr. Rutherford's deposition, and determined that relator failed to demonstrate that the commission had abused its discretion in its denial of that motion.
 {¶ 7} Fourth, the magistrate, while opining that Noll did not apply to deposition determinations, found in the alternative that the order denying the motion in this case would have beenNoll compliant. We agree with that assessment.
 {¶ 8} Fifth, relator argues that the magistrate erred in finding Dr. Meagher's opinions sufficient to support the commission's determination of permanent total disability. Based upon the substantial period of time between the reports and the corroborating evidence of a deterioration in respondent employee's condition, we agree with the magistrate that the reports read together are neither contradictory nor equivocal and are sufficient to support the decision of the commission.
 {¶ 9} For these reasons and those stated in the decision of the magistrate, the objections are overruled.
 {¶ 10} Following independent review, pursuant to Civ.R. 53, we find that the magistrate has properly determined the pertinent facts and applied the salient law to them. Accordingly, we adopt the decision of the magistrate as our own, including the findings of fact and conclusions of law contained in it. In accordance with the decision of the magistrate, the requested writ is denied.
Objections overruled; writ denied.
Bryant and Sadler, JJ., concur.
 APPENDIX A IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. : Owens Corning Fiberglass, : Relator, : v. : No. 03AP-684 Industrial Commission of Ohio : (REGULAR CALENDAR) and Mark F. Roberts, : Respondents. :
 MAGISTRATE'S DECISION Rendered on December 24, 2003 Taft, Stettinius Hollister LLP, Samuel M. Duran and C.Bradley Howenstein, for relator.
Jim Petro, Attorney General, and Phil Wright, Jr., for respondent Industrial Commission of Ohio.
Charles Zamora, LLC, and Charles Zamora, for respondent Mark F. Roberts.
 IN MANDAMUS {¶ 11} In this original action in mandamus, relator, Owens Corning Fiberglas, asks the court to issue a writ compelling respondent Industrial Commission of Ohio ("commission") to vacate its order denying leave to take the deposition of a commission specialist as well as its order awarding compensation for permanent total disability ("PTD"), and to issue a new order authorizing the deposition, followed by a new PTD hearing and decision.
Findings of Fact:
 {¶ 12} 1. In June 1997, Mark F. Roberts ("claimant") sustained an industrial injury, and his workers' compensation claim was allowed for a sprained sacroiliac and a ruptured disk at L4-5. Claimant underwent surgeries to treat the ruptured disk.
 {¶ 13} 2. In June 1998, claimant's surgeon, Michael J. Meagher, M.D., issued a report including the following:
* * * We are going to get him started in the Industrial Comm-ission's back rehab program working towards ultimate vocational rehabilitation into a more sedentary type of work, using the back rehab program to maximize his functional and physical recovery form his job-related injury. I do not however feel that the long-term goal of his back rehab should be to get him back into a position where he does any kind of heavy lifting or bending because I think he is totally and permanently disabled from doing this. I do not however feel that he is totally and permanently disabled from any gainful em-ployment. * * *
 {¶ 14} 3. Claimant participated in a return-to-work program that consisted of, or included, career counseling with training in job-seeking skills. In a discharge summary of August 1998, the counselor identified job options and listed vocational assets.
 {¶ 15} 4. In October 1998, Dr. Meagher reported:
* * * He has completed his Bureau Rehabilitation program. He did fairly well with that program. His major problem continues to be that of intolerance to sitting for any more than a half an hour to forty minutes. His legs become painful as does his back and he gets some tingling. His bladder function has improved as has his foot dorsiflexor weakness.
* * * Cranial nerves II-XII are intact. His knee jerks are 2+ and his ankle jerks are absent. He still has foot dorsiflexor weakness right greater than left in the range of 5-/5 on the left and 4+/5 on the right. He is able to toe walk. His sensory examination still reveals hypesthesia in the L5 through S3 dermatomes.
At this point in time I feel that he continues to be totally and permanently disabled from his previous employment, and that until he goes through vocational rehabilitation and schooling he will be unable to return to gainful employment. I have recommended that he pursue vocational rehabilitation as soon as possible so that he can get back in the work force in some type of gainful employment that does not require heavy lifting.
 {¶ 16} 5. In November 1998, the employer sent a letter to Dr. Meagher inquiring about maximum medical improvement and asserting that it had sent claimant for a vocational evaluation "which he barely participated in and the evaluator could not even recommend vocational options."
 {¶ 17} 6. However, in September 2000, an MRI showed a recurrence of disk herniation at L4-5 with compression of the thecal sac. Claimant had another surgery to remove a fragment of disk material and reduce compression.
 {¶ 18} 7. In April 1999, Dr. Meagher reported:
Mark Roberts was seen in follow-up today. He continues to be bothered by chronic intractable back pain and some burning below both knees.
His motor strength is unchanged. He is able to toe walk. He has some mild difficulty heel walking, but continues to show gradual improvement in the foot dorsiflexor function. He did go back to see Dr. Woodworth, and had to be put back on bladder medication * * *.
I continue to feel that he is totally and permanently disabled from his previous type of employment. He was seen by Dr. Colachis at Dodd Hall, and he recommended a trial of transcutaneous stimulation for the chronic intractable pain, as we have essentially maximized the Neurontin dosage. * * *
 {¶ 19} 8. On July 2, 2002, claimant again consulted Sam C. Colachis, III, M.D., an associate professor of medicine in the field of physical medicine and rehabilitation, whose impression was that, due to the herniated disk, claimant was experiencing cauda equina syndrome (a group of symptoms including low back pain, pain and numbness along one or both sciatic nerves, saddle sensory loss, bladder and bowel dysfunction, and various motor and sensory losses of the lower extremities), as well as "incomplete paraplegia." Dr. Colachis noted that claimant continued to have back pain "which is constant, but variable in severity" and which increased with certain activities. Because claimant was experiencing dizziness from medications, Dr. Colachis considered reducing the medicine for urinary function. In addition to neurogenic bladder dysfunction, claimant was having difficulty with lower limb weakness and neurogenic sexual dysfunction. Claimant's back was discolored from use of heating pads even though he had not used one recently. Dr. Colachis found limited range of motion as well as give-way weakness in the lower limbs, but he encouraged claimant to get out "as much as possible" and indicated that claimant "hopefully" could pursue vocational endeavors "at some time in the future."
 {¶ 20} 9. On July 3, 2002, Dr. Meagher provided a report that stated as follows:
I do continue to feel, as I have all along, that [Mark] Roberts continues to be totally and permanently disabled from his Workers Compensation injury. * * * He suffers from chronic back and bilateral leg pain and continues to have some weakness in his foot dorsiflexors.
There is no further surgical intervention indicated and I would wholeheartedly agree that he remains permanently and totally disabled.
 {¶ 21} On an accompanying page, Dr. Meagher answered "yes" when asked whether the allowed conditions prevented his patient from returning to his previous factory work. In addition, when asked whether the allowed conditions prevented his patient from engaging in "any gainful employment," Dr. Meagher again answered "yes." When asked to state the basis of this opinion, he referred to an attached evaluation of physical capacity. In that evaluation, Dr. Meagher opined that, in an eight-hour "work day," claimant could stand for less than one hour, walk less than one hour, and sit less than one hour. He stated that claimant could lift no weight nor engage in any pushing/pulling but could perform simple grasping and fine manipulation with his hands. Dr. Meagher also stated that claimant could not operate foot controls. He found that claimant could "not at all" bend, squat and crawl, and that he could climb stairs only occasionally.
 {¶ 22} 10. In July 2002, claimant filed a PTD application.
 {¶ 23} 11. On October 10, 2002, claimant was examined on behalf of the commission by James Rutherford, M.D., who reported as follows, in part:
At the time of the injury, Mr. Roberts stated he was paralyzed from the waist down and had trouble with his bladder as he couldn't void. He had surgery on June 16, 1997 by Dr. Meagher and this was a laminectomy at L-4 and a diskectomy at L4-5. This helped some. He then had a redo laminectomy at L4-5 on the left with a diskectomy for a free fragment on September 24, 2000. He had increased lower back pain and right leg pain prior to this surgery and the surgery helped some with the pain. Mr. Roberts stated he continued to have trouble with walking and sitting, however, after the two surgeries. After the first surgery he was in Dodd Hall with a urinary catheter for 6 wks. and then he was weaned away from the catheter but continued to have urinary urgency. He was also at the Camera [Rehabilitation] Center for 10 wks. and he stated he had a lot of trouble sitting because his back would hurt and his legs would go to sleep.
Mr. Roberts is still being seen by Dr. Meagher. His medications include Neurontin, 600mg BID, Celebrex, Cordura to relax his bladder, and Amitriptyline for sleep at night and to help avoid incontinence at night.
He stated if he doesn't avoid liquid in the evening that he may wet his bed at night yet. He stated he also has urgency concerning his bladder. He stated he can walk several blocks at one time. He stated he can sit about 45 min. at one time. He drives some for his own transportation. He stated that he drove from Newark to his exam today and he had to stop once to rest his back. He uses a TNS unit at night. He stated he has wet his bed a few times in the last 6 mons. He stated he has decreased sensation and some sexual dysfunction. During the day he tends to watch TV and takes care of the house some and runs the sweeper. He usually goes to his parent's house for dinner.
Diagnostic studies included a lumber MRI on June 25, 2000 which described a recurrent left paracentral disc herniation at L4-5 with mild to moderate compression of the left anterior aspect of the thecal sac. There is a central disc protrusion at L3-4 with mild to moderate flattening of the anterior margin of the thecal sac.
* * * Mr. Roberts also stated he uses an ankle foot orthosis or shoe insert for his right ankle and foot because his right foot tends to fall in. * * *
The medical records include a report from Dr. Michael Meagher dated July 3, 2002. * * * It stated he suffers from chronic back and bilateral leg pain. He continues to have some weakness in his foot dorsiflexors. He stated that no further surgical intervention was indicated and he would wholeheartedly agree that he remains permanently and totally disabled.
* * *
EXAMINATION:
Mr. Mark Roberts is 46 yrs. old. He is 5'11" tall and weighs 200 lbs. He had a satisfactory gait. He did only fair on the right side when standing on his toes or heels. He was able to walk in a tandem fashion and was able to do only 75% of a deep knee bend. On range of motion of his lower back he had flexion of 45 degrees with 60 being normal. He had extension of 5 degrees and lateral flexion of 15 degrees to each side. He had a 3" midline lumbar scar from his three previous back surgeries. He has some tenderness in the lower lumbar area with radiation into the right buttock. His calf circumferences were 15" on the right and 15 ½" on the left. Deep tendon reflexes were 1+ at each knee and 1+ at each ankle. On examination, motor function is only 4+/5 strength of the right extensor hallucis longus and there was 4+/5 strength on dorsiflexion, inversion and eversion on the right ankle. Straight leg raising was 65 degrees on the right and 65 degrees on the left in both the sitting and the supine positions. On sensory examination, there is decreased sensation over both the right and left lateral lower leg and lateral aspect of each foot. Mr. Roberts stated he also sometimes has decreased sensation in the right buttocks and the posterior thigh. He stated that he has some decreased sensation causing some sexual dysfunction. Mr. Roberts stated he has some good days and bad days and his flare-ups may last 3-4 days. He feels that he could not even do a sit-stand activity and would miss work days when he had flare-ups in his back. He stated he is uncomfortable all the time and this [a]ffects his concentration.
DISCUSSION:
Mr. Mark F. Roberts at the time of his injury on June 14, 1997 developed a cauda equine syndrome and had bladder problems and subsequently had a laminectomy at L-4 and a diskectomy at L4-5 on June 16, 1997. He required a urinary catheter for 6 wks. following this procedure and he was in the Camera Center for 10 wks. and had trouble sitting because his back would hurt and his legs would go [to] sleep. He eventually had a redo lumbar laminectomy on September 24, 2000 because of increased back pain and right leg pain. This helped some with his recurrent pain, but he continued to have trouble with walking and sitting. On physical examination he continues to have evidence of a radiculopathy in the right lower extremity with decreased sensation over the right lateral lower leg and foot and he also has decreased sensation over the left lower leg and foot. He sometimes has decreased sensation in the right buttock and right posterior thigh. He had only 4+/5 strength of the extensor hallucis longus on the right and in the muscles about the right ankle on dorsiflexion, inversion and eversion. He wore an insert in his right shoe. It helps stabilize the right ankle and this was molded about the heel and arch. He stated his right ankle tends to turn in on him.
It's my medical opinion that Mr. Roberts has a 10% PPI of the whole person related to a DRE Category III impairment of the lumbosacral spine with the reference being Table 72, Page 110. In addition, it's my opinion he has a 7% impairment related to weakness about his right ankle, which requires the use of the equivalent of a partial foot orthosis or an ankle support and the reference for this is Table 36, Page 76. Mr. Roberts initially had a cauda aquina syndrome with bladder difficulties and he still continues to have some tendency to wet his bed at night and urgency but this is controlled pretty much with medication.
Because of the above orthopedic problems related to the orthopedic claim allowances of claim #97-441952, it's my medical opinion that Mr. Roberts could sit only 4 hrs. out of an 8 hr. day, and he could stand and walk only occasional meaning 2 ½ hrs. out of an 8 hr. day. He could drive for his own transportation only. He could lift up to 15 lbs. occasionally. Mr. Roberts[,] however, has continued pain when sitting and has flare-ups of his symptoms in which he has increased difficulties and significantly decreased functional activities. It's my medical opinion that there is no combination of sitting, standing or walking that Mr. Roberts could do for an 8 hr. day for sustained remunerative work activity. It's my medical opinion that Mr. Roberts has a 16% PPI of the whole person based on his orthopedic claim allowances and that he is not capable of physical work activity and I've indicated this on the Physical Strength Rating form.
OPINION:
* * *
* * * Mr. Roberts has a 16% PPI of the whole person * * *. This is based on a DRE Category III impairment of the lumbosacral spine with the reference being Table 72, Page 110, which is a 10% PPI of the whole person. In addition, he has a 7% PPI of the whole person as a result of the need to use a partial ankle/foot orthosis because of weakness about his right ankle and the reference for this is Table 36, Page 76. * * *
* * * Based only on the orthopedic claim allowances and the orthopedic impairments related to those claim allowances, it's my medical opinion that Mr. Mark Roberts is not capable of physical work activity and I've indicated this on the Physical Strength Rating form.
(Emphasis sic.)
 {¶ 24} 12. On October 11, 2002, the employer filed a report by Walter H. Hauser, M.D., who found that claimant could not return to his former work but could perform limited sedentary work. Dr. Hauser opined that claimant could work on his feet for up to two hours as long as he had time in between to sit down, and that claimant could sit for six to eight hours as long as he had freedom to get up and move about so that there would be no "prolonged sitting."
 {¶ 25} 13. On October 25, 2002, the commission sent Dr. Rutherford a copy of Dr. Hauser's report, asking him to review it and determine whether it changed his opinion in any way. Dr. Rutherford responded that there was no change in his opinion, noting as follows: "Recent x-rays showed collapse at L4-5 disk space. No mention of sensory exam or deficit. See the discussion section of my report."
 {¶ 26} 14. In November 2002, the employer filed a motion for leave to take Dr. Rutherford's deposition, which was denied in February 2003. A motion to reconsider was denied.
 {¶ 27} 15. Two vocational reports were filed.
 {¶ 28} 16. In April 2003, the commission heard and granted the PTD application. The hearing officer, relying on the reports of Drs. Rutherford and Meagher, found that claimant was medically incapable of engaging in sustained remunerative employment. Due to that finding regarding medical capacity, the commission did not proceed to address the nonmedical factors. A motion to reconsider was denied.
Conclusions of Law:
 {¶ 29} In this original action in mandamus, the employer challenges an award of PTD compensation, raising a plethora of issues. It is settled that, where a claimant is medically unable to return to the prior employment but has a residual medical capacity to work, the commission first determines the residual medical capacity and then considers whether age, education, work history, etc., will permit the claimant to perform some type of sustained remunerative employment within his residual medical capacity. E.g., State ex rel. Stephenson v. Indus. Comm.
(1987), 31 Ohio St.3d 167. However, where the claimant does not have a residual medical capacity sufficient for sustained remunerative employment, there is no point in considering the vocational factors because the medical incapacity precludes employment in and of itself. State ex rel. Speelman v. Indus.Comm. (1992), 73 Ohio App.3d 757, 762. In those cases, the commission may grant PTD benefits without evaluating the nonmedical/vocational factors. Id.
 {¶ 30} Further, it is settled that the commission may find that a claimant can perform sustained remunerative employment even where he cannot perform a full range of sedentary work. Where some evidence supports the conclusion that the claimant can perform some type of job, the commission may deny PTD compensation. State ex rel. Wood v. Indus. Comm. (1997),78 Ohio St.3d 414, 418.
 {¶ 31} With respect to medical reports, the magistrate notes that a medical report cannot constitute "some evidence" when it is internally inconsistent or fatally ambiguous. E.g., State exrel. Eberhardt v. Flxible Corp. (1994), 70 Ohio St.3d 649;State ex rel. Chrysler Corp. v. Indus. Comm. (1998),81 Ohio St.3d 158.
 {¶ 32} In the present action, the employer contends that the commission abused its discretion in numerous ways: (1) that the reports of Drs. Meagher and Rutherford cannot constitute some evidence on which the commission could rely because both are equivocal, ambiguous, and otherwise defective; (2) that the commission abused its discretion in denying leave to take Dr. Rutherford's deposition because his report is internally inconsistent, substantially disparate from the other medical report, failed to consider all the allowed conditions, failed to consider claimant's vocational rehabilitation efforts, used the wrong standard for considering the claimant's impairment, and failed to state with adequate clarity whether the claimant was medically capable of sustained remunerative employment; (3) that the order denying leave to take the deposition also constituted an abuse of discretion because it failed to comply with State exrel. Noll v. Indus. Comm. (1991), 57 Ohio St.3d 203; (4) that the commission had a legal duty to find that claimant is precluded from PTD until he undergoes more vocational rehabilitation; and (5) that the commission abused its discretion in failing to consider the nonmedical/vocational factors, because there is no evidence that claimant is permanently and totally disabled solely on the basis of his medical factors.
 {¶ 33} With respect to Dr. Meagher's opinion, the employer first contends that his opinion of July 3, 2002, is ambiguous. The magistrate acknowledges that, when one initially reviews the narrative portion of this report, a question arises as to whether, in the context of his prior narrative reports, Dr. Meagher believed that claimant was medically disabled from returning to his prior factory job or whether he meant that claimant was medically disabled from returning to any type of work. However, the accompanying evaluation forms serve to clarify Dr. Meagher's opinion and eliminate any ambiguity. Here, Dr. Meagher stated unequivocally that claimant could sit for less than one hour in an eight-hour work day, and could stand and walk for less than one hour. Further, he stated unambiguously that the allowed conditions prevented claimant from performing "any gainful work." Thus, the narrative report was clarified by the accompanying questionnaires and evaluations, and the magistrate finds no fatal ambiguity or equivocation in the report as a whole.
 {¶ 34} Second, the employer contends that Dr. Meagher's evaluation of physical capacities is illogical because he stated that claimant could sit for less than one hour in an eight-hour work day, stand for less than one hour, and walk for less than one hour. The employer argues that the only options for a person during an eight-hour period are to sit, stand, or walk — unless the person is asleep. Therefore, according to the employer, the claimant must inevitably sit, stand or walk for a total of eight hours during each eight-hour work day in some combination.
 {¶ 35} The magistrate disagrees. An injured person has options other than sitting, standing and walking during an eight-hour period, such as reclining partially or lying down completely. Further, the option of sleeping during the day is a realistic one for injured persons whose pain and other impairments may prevent them from sleeping adequately at night. Moreover, the fact that an injured person is able to maintain a particular posture for 45 minutes is not necessarily equivalent to being able to perform remunerative work while maintaining that posture for 45 minutes. For example, an injured person who can rest in a chair for two hours is not necessarily able towork for two hours while in that chair. Consequently, the magistrate finds no defect in Dr. Meagher's opinion that claimant can sit, stand and walk for less than one hour each during an eight-hour work day. Similar arguments with respect to Dr. Rutherford's report are, likewise, not well taken.
 {¶ 36} The employer further argues that Dr. Meagher's reports in 1998 are inconsistent with his reports in 2002 because he did not provide an express explanation as to why he changed his mind about the extent of impairment. However, considerable time passed between the earlier opinion that claimant was not disabled from all gainful work. Further, the magistrate notes that, in the interim, claimant's condition deteriorated to the point where additional surgery was necessary in 2000. Thus, due to passage of time and intervening events, a physician's change of opinion between 1998 and 2002 regarding his patient's extent of impairment does not demand an explicit discussion of how and why his opinion changed. In sum, the July 2002 opinions of Dr. Meagher constitute some evidence on which the commission could rely in deciding that claimant lacked medical capacity to perform any sustained remunerative employment.
 {¶ 37} Next, the magistrate notes that, because the commission's finding of medical incapacity was supported by the report of Dr. Meagher, any flaws in Dr. Rutherford's report would not require a writ of mandamus. E.g., State ex rel. QuartoMining Co. v. Foreman (1997), 79 Ohio St.3d 78 (refusing to disturb a PTD award, noting that, even if Dr. Smith's report were removed from evidentiary consideration, there still remained the cited report of Dr. Gatens to support the commission's decision). See, also, State ex rel. Mann v. Indus. Comm. (1998),80 Ohio St.3d 656.
 {¶ 38} Nonetheless, the magistrate addresses the arguments presented with respect to Dr. Rutherford's report. First, claimant argues that Dr. Rutherford's opinion was fatally illogical and inconsistent because no reasonable physician who stated that a claimant had satisfactory gait, 16 percent impairment under the DRE categories, ability to sit for four hours, ability to stand and walk for up to two and one-half hours, and ability to lift 15 pounds occasionally — could then conclude that the claimant would be unable to engage in any physical work activity. Indeed, the employer argues that Dr. Rutherford's opinion as to work capacity was "wholly unsupported" by the medical findings he set forth in his report.
 {¶ 39} In regard to the first argument, the magistrate finds no defect that requires the court to bar Dr. Rutherford's report from evidentiary consideration. The meaning of Dr. Rutherford's report, including the basis of his opinions, is reasonably understandable and logical, particularly when one reads his opinions in the context of the entire report. In describing the examination, Dr. Rutherford found a number of clinically observable symptoms, such as limited ability to heel-walk and toe-walk, inability to do a full knee bend, limited range of back motion for flexion and extension, and tenderness in the lumbar area with radiation to the buttock area. He found that deep tendon reflexes were reduced, and there was some loss of strength. In addition, Dr. Rutherford found sensory deficits, with decreased sensation in several areas of the lower extremities. Moreover, in relating claimant's medical history and in describing his examination and discussing it, Dr. Rutherford appears to have accepted claimant's description of symptoms, such as bladder dysfunction and substantial pain that affected his ability to function physically and mentally. Accordingly, upon consideration of Dr. Rutherford's entire report, including his frequent references to claimant's debilitating pain and incontinence, the magistrate cannot conclude that his ultimate opinion is inconsistent with his findings as a matter of law.
 {¶ 40} In reaching this conclusion, the magistrate was mindful that, in a PTD case, neither the commission nor the courts should attach too much significance to the numerical percentage of impairment assessed by a physician. See QuartoMining, supra, at 85; State ex rel. Koonce v. Indus. Comm.
(1994), 69 Ohio St.3d 436. Further, the magistrate notes that the DRE categories for orthopedic assessments in the AMA Guides are based largely upon clinically measurable factors such as range of motion, and upon level of treatment. The factor of pain is not assigned specific numerical equivalents for calculating the percentage of disability and is left to general consideration. Dr. Rutherford's calculation of a percentage indicates that the calculation did not include a numerical value for pain, which would explain why the percentage seems somewhat low with respect to an ultimate conclusion of incapacity for physical work activity.
 {¶ 41} Further, it is important to note the sequence and context of statements in the report, such as those in the following passage in which, initially, Dr. Rutherford states generally the capacity for sitting, etc., but then proceeds to focus on claimant's pain and its debilitating effect, leading to his ultimate conclusion:
* * * Mr. Roberts could sit only 4 hrs. out of an 8 hr. day, and he could stand and walk only occasional meaning 2 ½ hrs. out of an 8 hr. day. He could drive for his own transportation only. He could lift up to 15 lbs. occasionally. Mr. Roberts[,]however, has continued pain when sitting and has flare-ups of hissymptoms in which he has increased difficulties and significantlydecreased functional activities. It's my medical opinion that there is no combination of sitting, standing or walking that Mr. Roberts could do for an 8 hr. day for sustained remunerativework activity. It's my medical opinion that Mr. Roberts has a 16% PPI of the whole person based on his orthopedic claim allowances and that he is not capable of physical work activity
* * *.
(Emphasis added.) In this passage, Dr. Rutherford makes clear that, although claimant generally might be capable of sitting for four hours out of an eight-hour period and standing or walking occasionally, claimant nonetheless experienced significant pain even while sitting and would therefore be unable to perform these activities "for sustained remunerative work activity." Dr. Rutherford explicitly accepted the reports of pain and flare-ups and found that they would "significantly" reduce claimant's functional capacities, which supports his opinion regarding sustained remunerative work. In sum, the magistrate finds no fatal inconsistency between Dr. Rutherford's clinical findings, discussion, percentage of impairment, and his ultimate opinion as to work capacity.
 {¶ 42} Second, the employer argues that, when Dr. Rutherford opined that claimant was "not capable of physical work activity," he failed to consider the question of whether claimant could perform "sustained remunerative employment." The magistrate finds no merit in this argument. The question of whether a claimant is medically capable of sustained remunerative employ-ment is a question for the commission to decide, not the doctor. When a doctor states that a person is "not capable of physical work activity," that opinion is unambiguous, and the finder of fact can reasonably conclude that this means a medical incapacity for sustained re-munerative employment.
 {¶ 43} The report as a whole conveys the opinion that Dr. Rutherford believed that the functional impairment and debilitating pain rendered claimant unable to sit or stand sufficiently on a sustained basis to permit him to engage in sustained remunerative work. That is, although Dr. Rutherford initially described the amounts of time that claimant could maintain certain postures in general, he immediately qualified that opinion, stating that claimant experienced pain and flare-ups that would prevent him from engaging in sustained
remunerative work activity.
 {¶ 44} Third, the employer complains that Dr. Rutherford failed to discuss claimant's failure to attend vocational rehabilitation. However, the magistrate is aware of no requirement that a physician's report on medical impairment must also address vocational questions such as vocational rehabilitation. Indeed, the general rule is to the contrary — that a medical opinion based in part on nonmedical/vocational factors ordinarily cannot constitute "some evidence" on which the commission may rely, State ex rel. Shields v. Indus. Comm.
(1996), 74 Ohio St.3d 264, 268. However, where the doctor's medical and vocational commentaries can be separated, the commission may simply disregard a physician's opinions on vocational matters. State ex rel. Catholic Diocese of Clevelandv. Indus. Comm. (1994), 69 Ohio St.3d 560.
 {¶ 45} The employer also argues that Dr. Rutherford failed to list all the allowed conditions. The magistrate acknowledges that, although the claim is allowed for a sprained sacroiliac and ruptured lumbar disk, Dr. Rutherford focused solely on the ruptured disk. However, the commission relied on Dr. Rutherford in awarding disability compensation, not denying it. Here, consideration of an additional condition could only have added further impairment, and Dr. Rutherford had already considered the more severe disk condition that necessitated the surgeries and allegedly caused the permanent impairments.
 {¶ 46} Next, the magistrate considers the commission's denial of permission to take Dr. Rutherford's deposition. R.C. 4123.09
provides that parties may take depositions only with permission. Ohio Adm. Code 4121-3-09(6)(d) provides a procedure for requesting a deposition and lists factors for consideration, including whether a "substantial disparity exists between various medical reports on the issue" and "whether one medical report was relied upon to the exclusion of others."
 {¶ 47} However, in State ex rel. Cox v. Greyhound Food Mgt.,Inc., 95 Ohio St.3d 353, 2002-Ohio-2335, the Ohio Supreme Court clarified the standard for granting deposition requests. The court pointed out that a substantial disparity between percentage figures may be irrelevant when the disputed issue is not the claimant's percentage of disability. Id. at ¶ 18. Moreover, the court noted that substantial disparities in the evidence are commonplace in PTD cases and that, in a disputed disability matter, one of the primary purposes of holding a hearing is to present and debate the relative strengths and weaknesses of the medical reports. The court further observed that the enumerated factors for determining the reasonableness of a deposition were not exclusive and that, in some cases, it would be more appropriate to consider whether there is a defect in the report that can be cured by a deposition and whether the hearing itself is an equally reasonable option for resolving the questions.
 {¶ 48} Here, the magistrate has found no defect in Dr. Rutherford's report that would remove it from evidentiary consideration, as stated above. For the same reasons, the magistrate finds no defect that would require leave to take a deposition. As to the alleged substantial disparity, the magistrate finds none. For example, with respect to sitting, Dr. Colachis indicated that claimant could sit for only 30 minutes, and Dr. Meagher limited claimant to less than one hour. Dr. Rutherford indicated that claimant had the functional capacity to sit for up to four hours, while Dr. Hauser found that claimant could sit for six to eight hours. Thus, Dr. Rutherford was in the middle of the pack. The other capacities were similar, with Dr. Meagher permitting standing for less than one hour, Dr. Hauser permitting two hours, and Dr. Rutherford permitting two and one-half hours. With respect to lifting, Dr. Meagher found claimant could do no lifting at all, Dr. Rutherford found that claimant could lift up to 15 pounds occasionally, and Dr. Hauser allowed sedentary work, which includes lifting up to 10 pounds occasionally. Although Dr. Hauser concluded that claimant could perform limited sedentary work and Dr. Rutherford found that claimant could perform no work, these two categories are not that far apart, being adjacent categories on the scale of work capacities. Accordingly, claimant has not proved a substantial disparity that required a deposition. The PTD hearing provided an adequate opportunity to argue the various weaknesses and strengths of the medical reports, and the commission had discretion to deny a deposition of Dr. Rutherford.
 {¶ 49} Next, the employer contends that the commission abused its discretion in denying the deposition by failing to comply with Noll, supra. Assuming for the sake of argument that Noll
applies to deposition determinations, the magistrate concludes that the commission is not required to go into the same level of detail required in a PTD order where numerous medical and nonmedical factors may be at issue, and a final determination of benefits is being made. Here, the commission rendered a minimal but adequate order. First, the commission correctly identified the issue before it. Then, in citing Cox, it identified the standard it was applying. Last, in stating that the employer did not meet the criteria in Cox, the commission sufficiently indicated the grounds for its decision — that, to the extent there were weaknesses or defects in Dr. Rutherford's report, the hearing was an equally reasonable option for resolving the questions. The employer has not proven an abuse of discretion.
 {¶ 50} The employer also argues that the commission had a legal duty to find that claimant cannot receive PTD compensation until he undergoes more vocational rehabilitation. The magistrate disagrees. First, it is settled that the vocational factors come into play only where an injured worker has a residual medical capacity to work; where an injured worker lacks the medical/functional capacity to perform sustained remunerative work, then his vocational factors — such as transferable skills, work history, age and education — are irrelevant. E.g.,Speelman. Next, the Ohio Supreme Court has explained that, where a claimant's current lack of marketable skills is attributable to his own failure to engage in feasible training or education, then the cause of his lack of vocational skills is his own conduct, not the industrial injury. E.g., State ex rel. B.F.Goodrich Co. v. Indus. Comm. (1995), 73 Ohio St.3d 525; Stateex rel. Wilson v. Indus. Comm. (1997), 80 Ohio St.3d 250.
 {¶ 51} Here, the magistrate concludes that the employer has not met its burden of proof as to its legal theory nor as to the factual issues. With respect to the law, the magistrate rejects the argument that the commission must scrutinize vocational efforts even where the claimant does not have residual medical capacity for sustained remunerative employment.
 {¶ 52} With respect to the evidence, the employer has not met its burden of proof for excluding the opinions of either Dr. Meagher or Dr. Rutherford. Accordingly, the magistrate concludes that the commission cited "some evidence" to support its medical finding, and it thus had no obligation to discuss vocational matters. However, even if the court accepts that the commission has a legal duty to scrutinize vocational matters in cases where the claimant is medically precluded from sustained remunerative employment, the commission nonetheless has broad discretion to interpret the evidence and find facts. E.g., State ex rel.Burley v. Coil Packing, Inc. (1987), 31 Ohio St.3d 18. Here, the evidence is sufficiently diverse that the commission was not bound as a matter of law to find that claimant failed to make reasonable attempts at vocational rehabilitation.
 {¶ 53} The evidence shows that the claimant completed a variety of physical and vocational rehabilitation programs. The parties agree that, in mid-1998, claimant attended a vocational program, although the employer argues that claimant did not make a good-faith effort in that program. The employer relies heavily on the discharge report, which states among other things that claimant "expressed much concern regarding his return-to-work goals and his situation with his employer." The employer notes other statements reflecting claimant's uncertainty as to whether he should try to return to his former employer or consider taking an early retirement from the company. The employer interprets these items as showing lack of motivation to work. Further, the employer points to a November 1998 letter in which it asserted that claimant "barely participated" in one program and refused to participate in another, and that claimant had told someone he was not interested in vocational rehabilitation.
 {¶ 54} While the commission as finder of fact might find this evidence persuasive, it had no legal duty to do so. State exrel. Pass v. C.S.T. Extraction Co. (1996), 74 Ohio St.3d 373. Other evidence suggests full cooperation by claimant. For example, the vocational counselor in 1998 reported that claimant was punctual in attending sessions, attended all sessions, paid attention, did good work, and was cooperative, although he exhibited constant pain behavior. The evidence was subject to interpretation and does not conclusively prove a failure to engage in reasonable efforts to return to work.
 {¶ 55} Moreover, it is important to note that, in 1998, claimant was complaining of constant pain, and he finally underwent surgery in 2000 to remove a fragment and attempt to reduce pressure on nerve tissues. Thus, at the time of the employer's letter in 1998 complaining about lack of vocational efforts, a reasonable finder of fact could conclude that training was not feasible at that time due to the medical situation. The employer has not established that the commission had a legal duty to interpret the evidence as demonstrating that claimant refused to engage in reasonable vocational efforts. See Pass, supra.
 {¶ 56} Last, the magistrate addresses an additional issue that, although not briefed by the parties, arose upon review of the commission's order. As background, the magistrate notes that the commission cannot simply rely on a physician's "bottom line" identification of an exertional category but must base its decision on the specific restrictions imposed by the physician in the body of the report. For example, where a physician places the claimant generally in the sedentary category but has set forth functional capacities so limited that no sedentary work is really feasible (such as an inability to sit for more than 30 minutes), then the commission does not have discretion to conclude based on that report that the claimant can perform sustained remunerative work of a sedentary nature. See State ex rel. Libecap v. IndusComm. (Sept. 5, 1996), Franklin App. 96AP-29, affirmed (1998),83 Ohio St.3d 178. In Libecap, the problem was not that the doctor's report was defective because claimant was placed in the sedentary category. Doctors may be unaware of legal criteria and the doctor in that case had set forth clear and unambiguous functional restrictions in his discussion that would permit short periods of sedentary activity. Rather, the problem was with thecommission's finding of capacity for sedentary, sustained remunerative employment based on a report that, read in its entirety, clearly precluded sustained remunerative employment of a sedentary nature.
 {¶ 57} Conversely, where a physician's checklist states that the claimant is medically precluded from performing any sustained remunerative employment but where the narrative report, read in its entirety, clearly and unambiguously sets forth a capacity for sustained remunerative employment, then the commission lacks discretion to rely on that report for a finding of medical inability to perform any sustained remunerative employment.
 {¶ 58} In the present action, the magistrate was initially concerned that Dr. Rutherford's statement of inability to perform "any physical work activity" was based on an incorrect understanding of legal criteria, an incorrect belief that sustained remunerative employment is synonymous with full-time employment. See State ex rel. Toth v. Indus. Comm. (1997),80 Ohio St.3d 360, 362. Accordingly, the magistrate considered whether the commission had abused its discretion in relying on the category marked on the checklist rather than relying on the functional capacities set forth in the narrative report.
 {¶ 59} In the present action, however, the magistrate concludes that Dr. Rutherford's report, read in its entirety, does not clearly and unambiguously provide that claimant can engage in sustained remunerative employment on a part-time basis. As reviewed above, Dr. Rutherford initially stated capacities for maintaining certain postures for certain amounts of time in a day, but he immediately qualified that statement by explaining that this claimant, however, suffered from pain and flare-ups that reduced his capacity for work, and Dr. Rutherford then stated clearly that claimant was not medically capable of performing any physical work activity. Thus, although Dr. Rutherford acknowledged that claimant can perform certain activities during a day, he stated unequivocally that claimant could not perform these activities as work activity on asustained basis. Consequently, the magistrate rejects the argument that she herself raised. However, given the youthful age of this claimant and the generally favorable vocational characteristics, the magistrate believed it was important to scrutinize the commission's order thoroughly for any abuse of discretion in the finding of medical incapacity for sustained remunerative employment.
 {¶ 60} Based on the foregoing, the magistrate recommends that the court deny the requested writ of mandamus.
 /s/P.A. Davidson
P.A. DAVIDSON MAGISTRATE